2006 UT 37

**Arthur BENJAMIN, Plaintiff and Appellee,**

v.

**AMICA MUTUAL INSURANCE COMPANY, a Rhode Island corporation, Defendant and Appellant.**

No. 20040974.

Supreme Court of Utah.

July 7, 2006.

James A. Boevers, John S. Chindlund, Salt Lake City, for plaintiff.

S. Baird Morgan, Michael K. Woolley, Salt Lake City, for defendant.

PARRISH, Justice:

¶ 1 Defendant Amica Mutual Insurance Company ("Amica") seeks interlocutory review of the district court's grant of partial summary judgment in favor of its insured, plaintiff Arthur Benjamin. Amica challenges the district court's determination that ambiguity in Amica's insurance policies triggered coverage for various claims arising from alleged sexual assaults committed by Benjamin. We conclude that the unambiguous plain language of the policies provides for coverage of the claims in question. Therefore, although we disagree with its reasoning, we affirm the result reached by the district court.

## FACTS

¶ 2 In August 2000, Jeanette Borthick and Angela Allen filed separate lawsuits against Benjamin. Both Borthick and Allen, coworkers of Benjamin, alleged that he had sexually assaulted them. The women asserted identical causes of action for (1) assault, (2) battery, (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, (5) false imprisonment, and (6) invasion of privacy.

¶ 3 Borthick alleged that Benjamin sexually assaulted her on May 11, 2000, while the two were conducting business in Phoenix. According to Borthick, Benjamin forced his way into her hotel room and raped her. Though she alleged that Benjamin committed horrific, intentional acts, Borthick also claimed that Benjamin was liable for negligent infliction of emotional distress. While Benjamin admitted that he engaged in sexual intercourse with Borthick, he claimed it was consensual.

¶ 4 Allen's claims arose from a series of incidents that allegedly took place between May and October 1999 at several locales, including various hotels, Benjamin's home, and Allen and Benjamin's place of employment. Allen alleged that Benjamin sexually assaulted her on each of these occasions. Like Borthick, Allen sought damages for negligent infliction of emotional distress in addition to a variety of intentional torts. Benjamin denied that he ever engaged in any sexual activity with Allen.

¶ 5 Benjamin tendered the defense of both cases to Amica. Benjamin had purchased two insurance policies from Amica: a homeowners policy (the "Homeowners Policy") and a Personal Excess Liability Policy (the "Excess Policy"). The Homeowners Policy provided Benjamin with personal liability coverage of up to $300,000 per covered occurrence. Under that policy, Amica promised to defend allegations triggering coverage, even if they were "groundless, false or fraudulent." The Excess Policy provided for personal liability coverage of up to $2,000,000 "in excess of primary insurance."

¶ 6 Amica initially defended both cases, subject to a reservation of rights to deny coverage. But after questioning Benjamin under oath about the allegations, Amica discontinued its defense in the Borthick case. Amica continued to defend Benjamin in the Allen case, subject to its reservation of rights.

¶ 7 Borthick's claims against Benjamin were tried to a jury in February 2003. The jury rejected all of Borthick's intentional tort claims and found Benjamin liable only for negligent infliction of emotional distress. The trial court, however, entered judgment notwithstanding the verdict in favor of Benjamin on the ground that worker's compensation was Borthick's exclusive remedy for her claim of negligent infliction of emotional distress.

¶ 8 After the Borthick trial, Benjamin entered into settlement negotiations with both Borthick and Allen. Benjamin notified Amica of the negotiations and asked Amica to

participate, but Amica refused. Benjamin subsequently settled both cases and asked Amica to indemnify him for the settlement amounts; Amica again refused.

¶ 9 Benjamin filed a complaint against Amica, alleging three causes of action: (1) breach of the express terms of his insurance contracts, (2) breach of implied covenants of good faith and fair dealing, and (3) breach of fiduciary duties. Benjamin moved for partial summary judgment on the breach of contract claim, arguing that Amica breached its insurance contracts by discontinuing its defense in the Borthick case and failing to indemnify Benjamin for the amount he paid to settle the covered Borthick and Allen claims. Amica filed a cross-motion for summary judgment.

¶ 10 The district court ultimately granted Benjamin's motion for partial summary judgment, ruling that the claims for negligent infliction of emotional distress, false imprisonment, and invasion of privacy were covered by "Amica's insurance policies." The district court concluded that the policies were ambiguous as to coverage and that, as standard form contracts, the ambiguities should be construed in favor of coverage. The court further concluded that Amica had breached the terms of the policies by discontinuing its defense in the Borthick case and by failing to indemnify Benjamin for the amount he paid to settle the covered Borthick and Allen claims.

¶ 11 Amica filed a timely petition for interlocutory appeal. We initially transferred the matter to the court of appeals, which granted Amica's petition. We subsequently vacated the transfer order and recalled the case. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2001).

## ANALYSIS

¶ 12 We review the district court's grant of partial summary judgment "for correctness, granting no deference to the district court." *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 16, 134 P.3d 1122 (internal quotation marks and brackets omitted). A court appropriately grants summary judgment "only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotation marks omitted).

¶ 13 We begin by analyzing the duties that the policies imposed upon Amica in the Borthick and Allen cases. We conclude that the Homeowners Policy required Amica to defend Benjamin against all of the claims raised by Borthick and Allen. We further hold that the Homeowners Policy imposed upon Amica a duty to indemnify Benjamin with respect to the negligent infliction of emotional distress claims. Moreover, we conclude that the plain language of the Excess Policy provides coverage for two of the intentional torts alleged by Borthick and Allen. We therefore affirm the district court's holding that Amica breached its duty to defend in the Borthick case and its duty to indemnify in the Borthick and Allen cases. We disagree, however, with the district court's conclusion that the policies are ambiguous. We therefore affirm the district court's grant of partial summary judgment, but vacate its reasoning. Finally, we consider and reject Benjamin's request for an award of attorney fees and costs incurred in defending against this appeal.

## I. COVERAGE

¶ 14 "An insurance policy is merely a contract between the insured and the insurer." *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993). As a result, we interpret insurance policies as we do contracts: "if the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 21, 133 P.3d 428 (internal quotation marks omitted). Barring ambiguity, therefore, our exegesis of the policies focuses on the plain meaning of the language they employ. We first examine the Homeowners Policy and then move to the Excess Policy.

### A. The Homeowners Policy

¶ 15 The Homeowners Policy charged Amica with two specific duties in connection with the Borthick and Allen cases. First, it im-

posed a duty to defend Benjamin against all of the claims raised by Borthick and Allen. Second, it imposed a duty to indemnify Benjamin for the negligent infliction of emotional distress claims. We discuss each of these duties in turn.

## 1. The Duty to Defend

█ ¶ 16 When we engage in a duty-to-defend analysis, we focus on two documents: the insurance policy and the complaint. "An insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations of the complaint." *Fire Ins. Exch. v. Estate of Therkelsen*, 2001 UT 48, ¶ 21, 27 P.3d 555 (internal quotation marks omitted); *see also Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 8, 983 P.2d 575; *Sharon Steel v. Aetna Cas. & Sur.*, 931 P.2d 127, 133 (Utah 1997). In *Therkelsen*, we cited to an alternative formulation of this rule: " 'The test is whether the complaint alleges a risk within the coverage of the policy.' " 2001 UT 48, ¶ 21 n. 3, 27 P.3d 555 (quoting *Continental Cas. Co. v. Alexis I. duPont Sch. Dist.*, 317 A.2d 101, 103 (Del. 1974)). We must therefore determine if Borthick and Allen alleged claims that are covered by the terms of the Homeowners Policy. We conclude that they did.

¶ 17 We begin our analysis with the four corners of the Homeowners Policy. Because the duty to defend is contractual, *Therkelsen*, 2001 UT 48, ¶ 22, 27 P.3d 555, our starting point must always be the underlying policy. Section II, Coverage E of the Homeowners Policy describes Amica's duty to defend:

> If a claim is made or a suit is brought against an insured for damages because of *bodily injury* ... caused by an *occurrence* to which coverage applies, [Amica] will:
>
> ....
>
> 2. Provide a defense at [Amica's] expense by counsel of [Amica's] choice, even if the suit is groundless, false or fraudulent. [Amica] may investigate and settle any claim or suit that [Amica] decide[s] is appropriate. [Amica's] duty to settle or defend ends when the amount [Amica] pay[s] for damages re-

sulting from the *occurrence* equals [Amica's] limit of liability.

The policy defines the emphasized terms. It defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in ... [b]odily injury" (emphasis omitted). But the Homeowners Policy specifically excludes from coverage "bodily injury ... [w]hich is expected or intended by the insured" (emphasis omitted).

█ ¶ 18 With this contractual framework in mind, we can narrow our inquiry to whether Borthick and Allen alleged bodily injury that was caused by an accident and was not expected or intended by Benjamin. The parties do not dispute that Borthick and Allen have alleged bodily injury. And Amica does not develop any argument on appeal with respect to application of the "accident" requirement to the negligent infliction of emotional distress claims. Instead, Amica relies on the expected injury exclusion. We therefore confine our analysis to this exclusion.

¶ 19 Because Borthick and Allen both alleged that Benjamin sexually assaulted them, Amica argues that any resulting injuries must be treated as "expected or intended" injuries that are excluded from coverage under the policy. In Amica's view, the negligence claims are merely "creatively-labeled causes of action intended to trigger insurance coverage." We disagree.

█ ¶ 20 The crux of a claim for negligent infliction of emotional distress is unintentional injury. *See Harnicher v. Univ. of Utah Med. Ctr.*, 962 P.2d 67, 69 (Utah 1998) (describing one element of the tort as "unintentionally caus[ing] emotional distress to another" (internal quotation marks omitted)). By including in their complaints claims for negligent infliction of emotional distress, Borthick and Allen alleged an alternative theory of liability—that Benjamin unintentionally injured them. Though Borthick and Allen have also alleged that Benjamin committed intentional sexual assaults, that does not preclude them from pleading alternative causes of action.[1] And the fact that the

---

1. Indeed, the Utah Rules of Civil Procedure ex- plicitly authorize pleadings that seek "[r]elief in

underlying factual allegations were sufficient to satisfy the elements of a claim for negligent infliction of emotional distress is demonstrated by the result in the Borthick case.

¶ 21 In the Borthick case, an impartial jury reviewed the evidence and rejected Borthick's claims that Benjamin intentionally harmed her. The jury instead found Benjamin liable only for negligent infliction of emotional distress. In other words, the jury determined that while Benjamin had harmed Borthick, he had harmed her only *unintentionally*.[2] It would be an odd result indeed for this court to conclude that the factual allegations of the complaint could not support a claim for negligent infliction of emotional distress when the trial judge allowed that claim to go to the jury and when the jury found that the evidence supported such a claim.

¶ 22 Because Borthick and Allen alleged that Benjamin negligently and unintentionally inflicted emotional distress upon them, Amica had a duty to defend Benjamin until it could establish that those claims were not supported by the facts. Where factual questions render coverage uncertain, as is the case here, the insurer must defend until those uncertainties can be resolved against coverage. "When in doubt, defend." *Appleman on Insurance Law and Practice* § 136.2[C] (2d ed.2006).

¶ 23 Amica argues vigorously that we should follow the court of appeals' decision in *Rosas v. Eyre*, 2003 UT App 414, 82 P.3d 185. In *Rosas*, the court of appeals held

that an insurer had no duty to defend an assault claim brought against its insured where the insured's child allegedly attacked a disabled classmate and knocked him out of his wheelchair. *Id.* ¶ 26. Although the complaint contained an allegation that the plaintiff's injuries were "a direct and proximate result of [the defendant's] wrongful acts, omissions, negligence and recklessness," *id.* ¶ 4 (internal quotation marks omitted), the court reasoned that the insurer had no duty to defend because "the facts alleged in the complaint clearly demonstrate that a cause of action based solely on an intentional tort was intended." *Id. Rosas* is distinguishable, however, because unlike the complaint here, the complaint in *Rosas* did not allege a separate, alternative claim for relief sounding in negligence. Rather, it was uncontested in that case that the "complaint clearly sound[ed] .... in an intentional tort."[3] *Id.* ¶ 26 n. 7.

¶ 24 Where an insurance policy obligates an insurer to defend claims of unintentional injury, the insurer is obligated to do so until those claims are either dismissed or otherwise resolved in a manner inconsistent with coverage. Even where the complaint details egregious, intentional conduct, an expected injury exclusion like the one found in the Homeowners Policy does not relieve an insurer of its duty to defend claims of unintentional injury. Inferences and assumptions about an insured's intent to injure are improper and inconsistent both with the well-accepted practice of alternative pleading and with our oft-repeated instruction that "insurance policies should be construed liberally in

the alternative or of several different types." Utah R. Civ. P. 8(a). And they also provide that "[a] party may ... state as many separate claims or defenses as he has regardless of consistency." *Id.* at 8(e)(2).

2. Apparently, the jury believed Benjamin's defense, which was that he believed his sexual contact with Borthick to have been consensual and that any emotional distress associated with the sexual contact was the result of Benjamin's negligent belief that Borthick had consented.

3. To the extent that *Rosas* and similar cases from the court of appeals could be interpreted to preclude insurance coverage for negligence claims in all situations where a plaintiff also alleges alternative claims of intentional tort that are excluded from coverage, we decline to follow

them. *See, e.g., Fire Ins. Exch. v. Rosenberg*, 930 P.2d 1202, 1205 (Utah Ct.App.1997); *State Farm Fire & Cas. Co. v. Geary*, 869 P.2d 952, 955 (Utah Ct.App.1994). Rather, we emphasize that the appropriate inquiry is whether the complaint alleges claims sounding in negligence. To the extent that the underlying facts in any given case do not satisfy the elements of a claim for negligence, the negligence claim will be subject to dismissal. But that is not the situation here, as reflected by the undisputed facts establishing that the complaint asserted alternative claims sounding in both intentional tort and negligence, that the trial judge in the Borthick case allowed the negligence claim to go to the jury, and that the jury actually found in favor of Borthick on the negligence claim.

favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance." *United States Fidelity & Guar. Co. v. Sandt,* 854 P.2d 519, 521 (Utah 1993) (internal quotation marks omitted); *see also Farmers Ins. Exch. v. Versaw,* 2004 UT 73, ¶ 24, 99 P.3d 796.

 ¶ 25 Because Amica owed a duty to defend the negligent infliction of emotional distress claims, Amica owed a duty to defend *all* of the claims brought by Borthick and Allen. "[W]hen there are covered and non-covered claims in the same lawsuit, the insurer is obligated to provide a defense to the entire suit, at least until it can limit the suit to those claims outside of the policy coverage." *Appleman on Insurance Law and Practice* § 136.2[D] (2d ed.2006); *see also Mt. Airy Ins. Co. v. Greenbaum,* 127 F.3d 15, 19 (1st Cir.1997) ("[I]f an insurer has a duty to defend one count of a complaint, it must defend them all.").

¶ 26 We therefore affirm the district court's determination that Amica breached the terms of the Homeowners Policy by wrongfully withdrawing its defense in the Borthick case. Because Amica never discontinued its defense in the Allen case, it did not breach its duty to defend in that case. We now turn our discussion to the scope of Amica's duty to indemnify under the Homeowners Policy.

### 2. The Duty to Indemnify

 ¶ 27 Like the duty to defend, "[t]he duty to indemnify is a contractual one." *Fire Ins. Exch. v. Estate of Therkelsen,* 2001 UT 48, ¶ 14, 27 P.3d 555. "[A]ccordingly, the issue at hand is governed by the terms of the parties' contract." *Id.* The Homeowners Policy describes Amica's duty to indemnify as follows:

> If a claim is made or a suit is brought against an insured for damages because of bodily injury . . . caused by an occurrence to which coverage applies, [Amica] will:
>
> 1. Pay up to [Amica's] limit of liability for the damages for which the insured is legally liable. Damages include pre-

judgment interest awarded against the insured . . .

(emphasis omitted).

 ¶ 28 Like the duty to defend, the duty to indemnify is tied to the existence of covered claims. Therefore, for the same reasons that Amica was obligated to defend against the claims for negligent infliction of emotional distress, it was also obligated to pay "for the [covered] damages [arising from those claims] for which [Benjamin was] legally liable."

 ¶ 29 Typically, an insured's legal liability for damages arises when judgment is entered against him. In this case, however, Benjamin entered into settlement discussions with Borthick and Allen in an attempt to limit his potential exposure. While Amica was contractually entitled to participate in and control such discussions, it declined to do so, electing instead to gamble on the possibility that it could avoid any obligation for the claims altogether. As a result, Amica is now estopped from second-guessing Benjamin's decision to settle. *See Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. of Am.,* 448 F.3d 252, 258 (4th Cir.2006) ("The duty to indemnify depends upon liability, i.e., an insurer's obligation to pay a judgment or settlement." (internal quotation marks omitted)).

 ¶ 30 Benjamin's settlement agreements with Borthick and Allen render him legally liable for damages. Amica is therefore contractually obligated to indemnify Benjamin for any amount he paid to settle the negligent infliction of emotional distress claims. Because Amica refused to do so, we affirm the district court's conclusion that Amica breached its duty under the Homeowners Policy by failing to indemnify Benjamin for the amount he paid to settle Borthick's and Allen's negligent infliction of emotional distress claims. Because we do not have the settlement agreements before us, we cannot determine what amount, if any, Benjamin paid to settle those particular claims. We therefore instruct the district court to hold a factual hearing to determine that amount.

## B. The Excess Policy

¶ 31 We now shift our interpretative focus to the Excess Policy and conclude that its plain language creates coverage for two of the intentional torts alleged by Borthick and Allen: invasion of privacy and false imprisonment. We affirm the district court's determination that Amica breached its duty to indemnify Benjamin with respect to these claims. Because Amica does not dispute that the facts alleged by Borthick and Allen establish the elements of both torts, we do not address that issue.

¶ 32 We conclude that Amica owes a duty to indemnify under the Basic Liability Coverage provision of the Excess Policy. Under that provision, Amica promises to "pay for *injury* or damage for which a covered person becomes legally liable for an *occurrence* which is not insured by any primary insurance that a covered person is required to maintain." "Occurrence" is defined as:

1. an accident (including continuous or repeated exposure to similar conditions) *which results in bodily injury* or damage; or

2. an act (or series of acts of the same or similar nature) *which results in personal injury*

(some emphasis added). The term "injury" is defined by the Excess Policy as:

1. *bodily injury.*

2. *personal injury.*
 (a) wrongful eviction or detention.
 (b) libel.
 (c) slander.
 (d) defamation of character.
 (e) *invasion of privacy.*
 (f) *false arrest or false imprisonment.*
 (g) malicious prosecution

(some emphasis added). The Excess Policy provides no further definition of either "bodily injury" or "personal injury."

¶ 33 Read in concert, these provisions plainly express that—to the extent not covered by primary insurance—Amica will indemnify covered persons for liability incurred for personal injury arising from an invasion of privacy or false imprisonment.

We can find no exclusion that would operate to preclude coverage for such liability.

¶ 34 Amica argues that the Excess Policy's expected injury exclusion applies. That exclusion reads: "We do not provide coverage for ... *bodily injury* or damage which is either expected or intended by a covered person" (emphasis omitted). But the plain language of this exclusion states that it applies to claims for *bodily* injury—not to claims for *personal* injury. Indeed, the Excess Policy defines the term "personal injury" only in the context of seven *intentional* torts. If the expected injury exclusion operated to remove personal injury liability coverage for those seven torts, then the personal injury clause would be rendered a nullity. Such an interpretation is both illogical and inconsistent with the plain language of the exclusion, which clearly indicates that it applies only to claims for bodily, rather than personal, injury.

¶ 35 The scope of the coverage provided by the Excess Policy bolsters our conclusion. "True" excess policies do not "broaden the underlying coverage"—they merely "increase[ ] the *amount* of coverage available to compensate for a loss." Douglas R. Richmond, *Rights and Responsibilities of Excess Insurers,* 78 Denv. U.L.Rev. 29, 30 (2000). Policies that are labeled "excess" policies, however, are sometimes best described as umbrella policies. Umbrella policies widen the scope of coverage: "For example, an umbrella policy may insure against 'personal injury' when a primary policy only insures against 'bodily injury' and 'property damage.'" *Id.* at 31. The policies here mirror this example. Whereas the Homeowners Policy does not provide coverage for "personal injury" resulting from enumerated intentional torts, the Excess Policy includes an express provision giving rise to coverage for such liability. Therefore, the Excess Policy—despite its label—is best viewed as an umbrella policy. Indeed, the Excess Policy explicitly provides coverage for certain "injury or damage ... not insured by any primary insurance" (emphasis omitted). As a result, we read the Excess Policy as an umbrella policy separate and distinct from the Homeowners Policy.

¶ 36 That the claims of invasion of privacy and false imprisonment arise from alleged sexual assaults does not affect our analysis. The plain language of the policy, which guides our interpretation, expressly indicates personal injury liability coverage for these two torts, regardless of circumstance. Some policies contain express sexual misconduct exclusions, such as the one at issue in *Lopez v. New Mexico Public Schools Insurance Authority*, 117 N.M. 207, 870 P.2d 745, 747 (1994), which stated, "Sexual or physical abuse or molestation of any person ... *does not constitute personal injury* within the terms of this policy and as such *any claim arising, directly or indirectly, from the aforementioned is excluded*" (emphasis added). No such exclusion, however, is present in the Excess Policy. Instead, the Excess Policy broadly indicates coverage for "personal injury" resulting from an "invasion of privacy" or "false imprisonment."

¶ 37 We therefore hold that the Excess Policy imposed upon Amica a duty to indemnify Benjamin with respect to Borthick's and Allen's claims of invasion of privacy and false imprisonment. Accordingly, we affirm the district court's conclusion that Amica breached this duty by refusing to indemnify Benjamin for the amount he paid to settle those claims. We instruct the district court to hold a factual hearing in order to determine the amount of the settlement attributable to those specific claims.

## II. COSTS

¶ 38 We finally consider Benjamin's request for an award of the costs and attorney fees he incurred in defending against this appeal. While we deny the request, we instruct the district court to consider these costs and fees in its calculation of any future award it may enter in favor of Benjamin. *See* Utah R.App. P. 34(a) ("[I]f a judgment or order is affirmed, costs shall be taxed against [the] appellant unless otherwise ordered."); *see also Nalder v. Kellogg Sales Co.*, 6 Utah 2d 367, 314 P.2d 350, 353 (1957) ("The trial court failed to allow the defendant its costs for filing the record in the former appeal. This should be done.").

¶ 39 This is an interlocutory appeal; final judgment has yet to be entered. Under Utah Rule of Civil Procedure 54(d)(1), an award of costs is to be given to the "prevailing party" and is to "abide the final determination of the cause." In interpreting this provision, we embrace the rule promulgated by the Arizona Supreme Court: "Unless provided by statute, there shall be no application for costs or attorneys' fees made ... in connection with a petition for review by interlocutory appeal.... [I]ssues of costs and attorneys' fees, if any, shall abide the final resolution of the adjudication." *In Re Rights to the Use of the Gila River*, 171 Ariz. 230, 830 P.2d 442, 458 (1992). We therefore instruct the district court to evaluate Benjamin's request for costs and attorney fees incurred in defending against this interlocutory appeal when the case is finally resolved and it can identify the prevailing party.

## CONCLUSION

¶ 40 Because we find no genuine issue as to any material fact and conclude that Benjamin is entitled to judgment as a matter of law, we affirm the district court's grant of partial summary judgment. We hold that the unambiguous language of the policies imposed several duties upon Amica. First, the Homeowners Policy required Amica to defend Benjamin in the Borthick and Allen cases. Second, the Homeowners Policy required Amica to indemnify Benjamin for losses he sustained in connection with Borthick's and Allen's claims for negligent infliction of emotional distress. Third, the Excess Policy imposed upon Amica a duty to indemnify Benjamin for losses he sustained in connection with Borthick's and Allen's invasion of privacy and false imprisonment claims. We uphold the district court's conclusion that Amica breached its duty to defend in the Borthick case and its duty to indemnify in the Borthick and Allen cases. Affirmed.

¶ 41 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Judge PAYNE concur in Justice PARRISH'S opinion.

¶ 42 Having disqualified himself, Justice NEHRING does not participate herein; District Judge A. LYNN PAYNE sat.