OPINION OF THE COURT
Charles E. Ramos, J.
In motion sequence 005, defendants Standing General Commission on Christian Unity and Interreligious Concerns (GCCUIC) and Stephen J. Sidorak, Jr. move pursuant to CPLR 3212 for summary judgment to dismiss the action.
Background
This case arises from the alleged improper termination of the employment of the plaintiff W Douglas Mills (Mills) as associate general secretary of dialogue and interfaith relations (associate general secretary) for the GCCUIC, a program-related agency of the United Methodist Church (the Methodist Church).[1] The Book of Discipline of the United Methodist Church (2008) (the Book of Discipline) established the GCCUIC and describes its purposes, responsibilities, organization, church authority and powers. The Book of Discipline sets forth the law and doctrine of the Methodist Church. The introduction to the Book of Discipline describes it as:
“[T]he instrument for setting forth the laws, plan, polity, and process by which United Methodists govern themselves . . . It is the most current statement of how United Methodists agree to live their *298 lives together. It reflects our understanding of the Church and articulates the mission of the United Methodist Church . . . [It] defines what is expected of its laity and clergy as they seek to be effective witnesses in the world as a part of the whole body of Christ.
“This book of covenant sets forth the theological grounding of [the Methodist Church]” (Book of Discipline at v; Sidorak aff, exhibit A).
As established by the Book of Discipline, the GCCUIC is an agency that addresses the interreligious and ecumenical concerns of the Methodist Church. The Book of Discipline describes the purpose of the GCCUIC as follows:
“Purpose — The [GCCUIC] shall exercise its ecumenical leadership role in seeking to fulfill two major responsibilities in the context of the search for the unity of the human community and the renewal of creation:
“1. To advocate and work toward the full reception of the gift of Christian unity in every aspect of the Church’s life and to foster approaches to ministry and mission that more fully reflect the oneness of Christ’s church in the human community.
“2. To advocate and work for the establishment and strengthening of relationships with other living faith communities, and to further dialogue with persons of other faiths, cultures, and ideologies” (id. at 676, ¶ 1902).
Organizationally, the GCCUIC has a Board of Directors, under which sits an Executive Committee, followed by other standing committees. The general secretary sits on the Executive Committee and the associate general secretary works under the general secretary.
The terms of Mills’ employment as associate general secretary are found in the Book of Discipline and in the personnel policies and procedures (the Personnel Manual) as enacted by the GCCUIC. The Book of Discipline describes the associate general secretary as the “associate staff officer” of the GCCUIC, an “executive staff” position (id. at 476, ¶ 703.7). Individuals hired to this position are elected by the GCCUIC, but the Book of Discipline provides conflicting information with respect to the timing of elections. Prior to 2008, paragraph 713 of the Book of Discipline provided for the election of associate general secretaries to occur annually (rule 19-a statement ¶ 25).
*299 In 2008, this provision was amended to provide for election of associate general secretaries to occur quadrennially. This contradicts paragraph 1905.6 which provides that associate general secretaries shall be elected by the general commission “annually by ballot” (Book of Discipline at 679, ¶ 1905.6; Sidorak aff, exhibit A). The Book of Discipline does not contain any reference to duration or term of employment post-election.
As a prerequisite to employment, the Book of Discipline requires that associate general secretaries shall be “professing members of The United Methodist Church” and
“shall be persons who model themselves after the servanthood of Jesus Christ. They shall be persons of genuine Christian character who love the Church and are committed to the oneness of the body of Christ, are morally disciplined and shall uphold the doctrinal and ethical standards of The United Methodist Church as set forth in the Doctrinal Standards and Social Principles, and are competent to administer the affairs of a general agency” (rule 19-a statement ¶ 29).
A detailed description of the associate general secretary’s duties is outlined in a GCCUIC internal memo that the defendants submitted in support of their motion (Traub aff, exhibit E, exhibit 18 to Mills deposition). In deposition testimony, Mills confirmed that the memo contains a job description for the position for which he later applied (Traub aff, exhibit E at 190). As described in the memo, the focus of the position is to “promote and further theological dialogue with other Christian Communications and interfaith partners” (id. exhibit 18). The memo lists duties and responsibilities for the position such as “Organizes work in bilateral dialogues and interfaith relations,” “Develops plan of action for dialogues in cooperation with partners,” and “Represents the agency, as required.”
Under the heading “Skills and Education Desired,” the memo indicates that a Master’s level education in theology, experience with ecumenism and interfaith relations, and “[tjheological acumen” are required (id.). Finally, the memo describes the position as a “Decision Making Role” and lists job duties that include making recommendations for “educational and programmatic resources,” conferring with the general secretary concerning ecumenical concerns and making recommendations to various committees, and conferring with other GCCUIC staff and with “ecumenical partners on critical issues concerning the expansion of dialogue initiatives” (id.).
*300 Regarding employee termination, the Book of Discipline provides that the councils, boards, committees, or commissions elected, authorized, or provided for by the General Conference, including the GCCUIC:
“[Sjhall have full power and authority to remove and dismiss at their discretion any member, officer, or employee thereof:
“1. Who has become incapacitated so as to be unable to perform official duties.
“2. Who is guilty of immoral conduct or breach of trust.
“3. Who for any reason is unable to or who fails to perform the duties of the office or for other misconduct that any council, board, committee, or commission may deem sufficient to warrant such dismissal and removal” (Book of Discipline at 488, ¶ 711; Sidorak aff, exhibit A).
Additionally, the Personnel Manual contains the following “at will” language:
“All employees of the GCCUIC are employed at will and not by contract. Employment at will means you and the GCCUIC are each free to terminate the employment relationship at any time without notice and for any reason.
“Whether or not the disciplinary procedures described herein are followed, all employees are subject to dismissal without notice at any time, when in the sole opinion of management, the employee’s job performance and/or conduct is found unsatisfactory for any reason” (Traub aff, exhibit E, exhibit 6 to Mills deposition).
Mills holds Master’s degrees in Divinity and Theology, both from Duke University Divinity School, and a Doctorate of Philosophy from Texas Tech University (rule 19-a statement ¶ 30). He is an ordained minister of the Methodist Church and an “Ordained Elder in Full Connection” (id.). In his capacity as an ordained minister, Mills is authorized to “preach and teach the Word of God, to provide pastoral care and counsel, to administer the sacraments of Baptism and Holy Communion, and to order the life of the church for service in the mission and ministry” (id. ¶ 33).
From 1984 to 2004, Mills held pastoral positions within the Methodist Church. In late 2004, he applied for the associate *301 general secretary position with the GCCUIC and was hired and elected pursuant to the provisions of the Book of Discipline. In June 2005, he commenced employment with the GCCUIC. The parties did not execute an employment contract or agreement at the commencement of Mills’ employment or at any time thereafter. After his initial election, Mills was reelected to the position in September 2005, September 2006, December 2007, and September 2008.
As an ordained minister, Mills was designated by the GCCUIC as a clergy employee with the Methodist Church (Williams aff, exhibit A). A form issued by the General Board of Pension and Health Benefits of the United Methodist Church dated July 12, 2005 verifies his enrollment in the ministry pension plan and indicates that he was a clergyperson and elder in full connection assigned to an “extension ministry” (id.). For each year of his employment, Mills claimed a housing exemption authorized for “ministers” under Internal Revenue Code (26 USC) § 107, as amended by the Clergy Housing Allowance Clarification Act of 2002, which provides an exclusion from gross income for a “housing” allowance for those who are a “minister of the gospel” (rule 19-a statement ¶ 58). This exemption allows ministers to pay income tax on only a portion of their salary.
As associate general secretary, Mills submits that he worked to advance the goals of the GCCUIC as outlined in the Book of Discipline. As a representative of the GCCUIC and the Methodist Church, he participated in ecumenical dialogues with a variety of interfaith organizations and ministries where he “articulat[ed] primarily United Methodist perspectives, positions, tradition, history” and communicated and interpreted “the United Methodist understanding of itself as a church with other church bodies and across interreligious relationships” (Traub aff, exhibit F at 61-62).
During the course of his employment, Mills authored several papers, presentations, and a book titled Make Us One With Christ: the Study Guide Version designed to advance ecumenical dialogue. Mills listed several of these writings and presentations as “major accomplishments” in a 2007 employee performance review, separating the items under the headings “advancing ecumenical dialogue” and “advancing interfaith relations” (Traub aff, exhibit E, exhibit 4 to Mills deposition). In a description of “ ‘minor’ accomplishments,” he also wrote “I would note preaching during the Week of Prayer for Christian Unity *302 and attendance at the National Workshop on Christian Unity” (id.).
In his capacity as associate general secretary, Mills traveled frequently to represent the GCCUIC both domestically and internationally. For example, Mills was a member of a delegation to the Vatican that included an audience with Pope Benedict XVI and another to Israel that included meetings with Israeli and Palestinian leaders (Williams aff, exhibit D). On each of these occasions, Mills donned his minister collar and attire and presented himself as a minister (id.).
In early 2008, Mills applied for the vacant position of general secretary of the GCCUIC, but was not hired. In July 2008, Sidorak was hired to fill the position and became the general secretary. Mills remained associate general secretary.
In August 2008, Bishop Rader (Rader), the ecumenical officer of the council for bishops for the United Methodist Church, forwarded Sidorak an email written by Mills. In the email, Mills indicated that Sidorak “had not read [the] Book of Discipline in twenty years” and expressed discontent that he was in the general secretary position (Traub aff, exhibit F at 36-38; rule 19-a statement ¶¶ 78-80). Sidorak perceived these statements as an attack that undermined his ministry and the GCCUIC (Traub aff, exhibit F at 38-42).
In a memo dated September 5, 2008, Sidorak documented his objections to Mills’ behavior (id. ¶ 80). Both men signed this document, which constituted a written warning, and it was placed in Mills’ personnel file (id.). Mills and Sidorak also had two subsequent conversations wherein Mills apologized to Sidorak and assured him that he would refrain from engaging in similar behavior in the future (19-a statement ¶¶ 81-82). Based on these representations, Sidorak recommended Mills for reelection as associate general secretary, and Mills was, in turn, reelected.
Nonetheless, on March 9, 2009, Sidorak conducted a conference call with the Personnel and Executive Committees of the GCCUIC where he informed the committee members of his decision to terminate Mills’ employment with the GCCUIC (Traub aff, exhibit F at 85-87). The reasons given for termination were “unwillingness to follow instructions of [his] supervisor, ineffectiveness in performance, insubordination, untrustworthiness, undermining the ministry of the General Secretary and disrespecting and disparaging the Board of Directors of the [GCCUIC],” and “repeated undiplomatic behavior reported *303 regularly by our ecumenical partners and ongoing conduct unbecoming a ecumenist” (Sidorak aff, exhibit G). On March 12, 2009, Sidorak informed the Board of Directors of Mills’ termination (rule 19-a statement ¶ 96).
Mills subsequently obtained a ministerial appointment as senior pastor of the Trinity United Methodist Church in Amarillo, Texas.
Standard of Review
Summary judgment is appropriate where the court determines that there are no material triable issues of fact (CPLR 3212 [b]). The proponent of a motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering “sufficient evidence to demonstrate the absence of any material issues of fact” (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]). To defeat the motion, the opposing party must then come forward with proof establishing the existence of triable issues of fact (id.). The court must view facts in the light most favorable to the non-moving party (id.), but conclusory or unsupported allegations are insufficient to raise a triable issue of fact (Amatulli v Delhi Constr. Corp., 77 NY2d 525 [1991]).
If the party opposing the motion cannot present evidentiary proof in admissible form, he or she must come forward with an acceptable excuse for his or her failure to present evidence in an admissible form (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). “[A] party does not carry its burden in moving for summary judgment by pointing to gaps in its opponent’s proof, but must affirmatively demonstrate the merit of its claim or defense” (Velasquez v Gomez, 44 AD3d 649, 650-651 [2d Dept 2007]).
Discussion
The GCCUIC argues that adjudication of this matter violates the Establishment and Free Exercise Clauses of the Constitution, specifically citing the “ministerial” exception recently confirmed by the United States Supreme Court in Hosanna-Tabor Evangelical Lutheran Church and School v EEOC (565 US —, 132 S Ct 694 [2012]). Mills argues that Hosanna-Tabor is inapplicable because he was not employed by the GCCUIC in a ministerial capacity and the whole of his employment activities was secular in nature, which the GCCUIC disputes.
Mills also argues that Hosanna-Tabor, an employment discrimination case, is inapplicable to contract claims. Unfortu *304 nately, this argument rests on a misreading of Catholic Charities, a 2006 case from the New York Court of Appeals (Catholic Charities of Diocese of Albany v Serio, 7 NY3d 510, 524 [2006], cert denied 552 US 816 [2007]). Catholic Charities predates Hosanna-Tabor and explicitly states that “the ministerial exception has no bearing here; this case does not involve the right of a church to determine who it will employ to carry out its religious mission” (Catholic Charities, 7 NY3d at 524).
In Hosanna-Tabor, the Supreme Court did not address this issue and noted that “[the Court] express [es] no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers” (Hosanna-Tabor, 565 US at —, 132 S Ct at 710). It is the determination of this court that Hosanna-Tabor addresses relevant issues of law and is applicable to the instant case.
The Free Exercise and Establishment Clauses of the United States Constitution provide that “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof” (US Const Amend I). Interpreting these clauses, federal courts have long recognized that the First Amendment “bar[s] the government from interfering with the decision of a religious group to fire one of its ministers” (565 US at —, 132 S Ct at 702). In Hosanna-Tabor, the Court confirmed the exception and examined whether it applied to an individual who performed mixed secular and ministerial duties.
The plaintiff in Hosanna-Tabor, Cheryl Perich (Perich), was a “called” teacher at a school operated by Hosanna-Tabor Evangelical Lutheran Church and School (Hosanna-Tabor), a member congregation of the Lutheran Church-Missouri Synod, the second largest Lutheran denomination in America. Schoolteachers at Hosanna-Tabor are classified as either “called” or “lay” teachers. Both perform the same duties, but called teachers are regarded as having been called to their vocation by God through a congregation. Perich began her employment as a lay teacher, but was later asked to become a called teacher. She accepted and received a “diploma of vocation” designating her a commissioned minister (565 US at —, 132 S Ct at 700). Sometime later, she became ill and was eventually fired. When the Equal Employment Opportunity Commission sought to bring a claim on her behalf for violations of the Americans with Disabilities Act, the parties disputed whether the action was barred by the ministerial exception.
*305 In determining whether the ministerial exception applied, the Court noted that “the ministerial exception is not limited to the head of a religious congregation,” but refrained from adopting a rigid standard for determining when an employee qualifies as a minister (565 US at —, 132 S Ct at 707-708). Instead, the Court examined the circumstances of Perich’s employment to determine whether the exception applied. It is incumbent upon this court to make a similar inquiry.
In performing its inquiry, the Court took note that Perich held the title of “Minister of Religion, Commissioned” and performed some ministerial duties in the course of her employment. The Court commented that “[although such a title, by itself, does not automatically ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant, as is the fact that significant religious training and a recognized religious mission underlie the description of the employee’s position” (565 US at —, 132 S Ct at 708).
The Court examined Hosanna-Tabor’s treatment of Perich and found that the school “held [her] out as a minister, with a role distinct from that of most of its members” (565 US at —, 132 S Ct at 707). It also examined how Perich presented herself and found that she held herself out as a minister of the church by “accepting the formal call to religious service, according to its terms,” by claiming the same housing tax exemption authorized for “ministers” that Mills claimed during each of the years he was employed with the GCCUIC, and by referring to herself as a member of the “teaching ministry” (565 US at —, 132 S Ct at 707-708).
Examining the circumstances of Perich’s employment and duties, the Court found that Perich’s job duties “reflected a role in conveying the Church’s message and carrying out its mission” (565 US at —, 132 S Ct at 708). The Court held that the ministerial exception applied even though Perich performed mixed ministerial and secular functions and ministerial duties occupied only a small amount of her time, approximately 45 minutes a day. Finally, the Court noted that “though relevant, it cannot be dispositive that others not formally recognized as ministers by the church perform the same functions” (565 US at —, 132 S Ct at 708).
Unlike Hosanna-Tabor, it is undisputed that Mills is an ordained minister. He has several years of religious education and held ministerial positions before and after his employment with the GCCUIC. Pursuant to Hosanna-Tabor, the fact of his *306 ordination is relevant to this inquiry. Nonetheless, Mills argues that the ministerial exception does not apply because his job duties with the GCCUIC were wholly secular. For the following reasons, this court disagrees.
In Hosanna-Tabor, the Court noted it was relevant that “significant religious training and a recognized religious mission underlie the description of the employee’s position” (565 US at —, 132 S Ct at 708). The GCCUIC required candidates for the associate general secretary position be “persons who model themselves after the servanthood of Jesus Christ” with a Master’s level education in theology, experience with ecumenism and interfaith relations, and “[tjheological acumen.” Therefore, it is evident that the position requires “significant religious training.”
As to whether “a recognized religious mission underlie[s] the description of the employee’s position,” the record indicates that the focus of the associate general secretary position is to “promote and further theological dialogue with other Christian Communications and interfaith partners” and to promote the purposes of the GCCUIC. Mills characterizes the purposes of the GCCUIC as “to advocate and work toward the full reception of the gift of Christian unity and to strengthen relationships with other living faith [sic] and to dialogue with persons of other faiths, cultures and ideologies” (opp mem at 2-3).[2] Despite Mills’ arguments to the contrary, these are clearly religious purposes and a “recognized religious mission” underlies his job description.
Similar to the manner in which Hosanna-Tabor “held Perich out” as a minister, the GCCUIC held Mills out as a minister by classifying him as a ministerial employee and designating him as a clergyperson assigned to an “extension ministry.” Mills held himself out as a minister by claiming the housing tax exemption and presenting himself as a minister while conducting official GCCUIC business, and by wearing his collar and ministerial attire during business travel.
*307 Pursuant to Hosanna-Tabor, even if Mills performed primarily secular duties, the ministerial exception will apply if his job duties “reflected a role in conveying the Church’s message and carrying out its mission” (565 US at —, 132 S Ct at 708). The record indicates that Mills acted as a representative of the GCCUIC and the Methodist Church by participating in ecumenical dialogues with a variety of interfaith organizations and ministries where he “articulat[ed],” communicated, and interpreted the “perspectives, positions, traditions” and the history of the United Methodist Church. During the course of his employment, he also wrote and published a variety of ecumenical writings and presentations which he touted as professional accomplishments in at least one performance review with the GCCUIC. On at least one occasion, he performed ministerial duties when he “preach[ed] during the Week of Prayer for Christian Unity.” Given all of these factors, it is clear that Mills had “a role in conveying the Church’s message and carrying out its mission.”
Furthermore, adjudication of Mills’ claims would require this court to interpret various sections of the Book of Discipline, a constitutionally questionable endeavor at best, given the religious nature of the text. Specifically, this court would be obliged to examine Mills’ behavior and determine whether his termination was justified under paragraph 711 of the Book of Discipline which enumerates reasons that an associate general secretary may be terminated. Because New York law does not have legal standards for “immoral conduct” or “breach of trust,” there is no basis in law for this court to determine whether Mills violated these provisions.
Assuming, arguendo, that this court was constitutionally permitted to adjudicate this matter, Mills has failed entirely to present evidence that the parties entered into an employment contract or that the GCCUIC made a clear and unambiguous promise of employment. New York courts have long adhered to the “traditional American common-law rule undergirding employment relationships . . . the presumption that employment for an indefinite or unspecified term is at will and may be freely terminated by either party at any time without cause or notice” (Horn v New York Times, 100 NY2d 85, 90-91 [2003]). There is a narrow set of exceptions to this rule, none of which are relevant to the present action (id.).
The parties did not enter into an explicit agreement for a fixed duration of employment, but Mills argues that there was *308 an implied four-year agreement because the Book of Discipline calls for the election of associate general secretaries to occur quadrennially. This argument is without merit. Not only does the Book of Discipline provide conflicting information regarding the timing of elections, it also does not refer to a term of office. This cannot be construed as an agreement for a fixed term of employment precluding employment at will. Additionally, the Personnel Manual contains a clear and unambiguous “at will” provision. Finally, if Mills’ employment was not at will, his termination would be subject to the terms of paragraph 711 of the Book of Discipline which, as described above, this court cannot interpret as a matter of law.
Therefore, for the reasons stated above, it is the finding of this court that this action is without merit.
Accordingly, it is ordered that the defendants’ motion for summary judgment is granted and the complaint is dismissed with costs and disbursements to the defendants as taxed by the Clerk upon the submission of an appropriate bill of costs.

. At the outset, this court notes that Mills indicates that several of the facts described in the defendants’ rule 19-a statement (Rules of Commercial Div of Sup Ct [22 NYCRR 202.70 (g)]) are “disputed” and even goes so far as to assert that the defendants have “fabricated] outright falsehoods,” yet fails to present evidence to support the accusations. Accordingly, facts not disputed have been deemed admitted pursuant to Commercial Division rule 19-a and conclusory or unsupported allegations have been disregarded.

. Or as described in the Book of Discipline:
“1. To advocate and work toward the full reception of the gift of Christian unity in every aspect of the Church’s life and to foster approaches to ministry and mission that more fully reflect the oneness of Christ’s church in the human community.
“2. To advocate and work for the establishment and strengthening of relationships with other living faith communities, and to further dialogue with persons of other faiths, cultures, and ideologies.” (Book of Discipline at 676, ¶ 1902.)